The 4th District Appeal Court of the State of Illinois is reconvened. The Honorable Robert J. Stiglitz presiding. You may be seated. So this is our second case of the day. Number 4-25-0075. Remember, this is Robert Craig here for the appellant. Who said your name, ma'am? Yeah, Carlozzi. Carlozzi? Carlozzi. Okay, no T. Carlozzi, not Carlozzi. I mean, if you want to be Carlozzi, you can buy it. I think it's Carlozzi, but... No, no, Carlozzi, I... Everyone knows I write the other name pronounced correctly, and I will do my best. Thank you. And for the appellate, Mr. Robinson? Well, that's a terrible introduction, because my second-level student is Julie Matuszewski. I'm David Robinson for the appellant, and she will be our second-level student. Matuszewski? Matuszewski. Matuszewski. Matuszewski. Matuszewski. See you around. Okay, again, I'll do my best. You do your best. Thank you. Ms. Carlozzi, you may proceed. Good afternoon. May I please the court, counsel? My name is Anna Carlozzi. I'm with the Office of the State Appellate Defender. I'm here on behalf of Mr. Robert Deere. Mr. Deere has raised four issues before this court. Reasonable doubt, ineffective assistance of counsel, counsel of choice, and a criminal issue. But at the heart of all of these issues is a common thread, condensed timelines. Only two days past... Excuse me. Yes. What was the common thread? Condensed timelines. Condensed timelines. Yes. Okay, I want to make sure you're ready for it. Go ahead. Only two days past between Mr. Deere's alleged absence from the home he lived in with Rebecca Altschuh and the alleged home invasion. This time frame is why the distinction between dwelling place of another and authority to enter was crucial. And why defense counsel's failure to distinguish these concepts for the jury was fatal to Mr. Deere's defense. Then, only six days passed between counsel's answer to Reddy and Mr. Deere's trial, which left Mr. Deere with less than a week to attempt to obtain private counsel while he was incarcerated. Finally, many of Mr. Deere's... How do we know that? He could have been trying to obtain counsel throughout the time that he was incarcerated, couldn't he? I suppose, but while he was incarcerated, he was sending mail to the public defender. Yeah. And so, he had only indicated that it seemed recent that he had been trying to obtain private counsel. Well, he answered Reddy for trial on the 5th. Counseling to Reddy for trial on the 5th, yes. And the defendant had no problem voicing his opinions about things. He was writing letters and everything else goes in. Yes, but I'm not sure... Okay, so the defendant didn't say, wait a minute, no, I'm not ready. Yeah, at that point, I'm not sure if Mr. Deere... September 9th, he answered Reddy for trial again. Yes. September 11th, they start picking the jury. What happens then? Well, before the jury comes out, Mr. Deere says that, asks, requests for a continuance so he can try to obtain counsel. Was there a jury selection or had the jury been selected? The jury had not been selected.  No more Deere had occurred. This was the first thing that happened on September 11th. When was he charged? When was he charged? Yes. I think June 17th. He was arrested June 17th. His first court appearance was June 18th. June 28th was when the public defender was first appointed. And August 1st was when his specific public defender first appeared on his case. And also the first day he met with that public defender. That's the day he demanded trial. And the case was... He demanded a speedy trial. Yes, correct. And the case was then set for September 5th. Excuse me, the trial was then set for September 5th. On the 11th, did he ask for a continuance? The 11th of...  Yes, because that was the day the trial began. Did he ask for a continuance? He... I'm not sure if he asked specifically for a continuance, but he said that he wanted time to obtain a private attorney. Right. Did he say he was willing to give up his speedy trial? He did not, but he was not asked that. But because he did not demand speedy trial until August 1st, his speedy trial term did not end until the end of November. And this was September 11th. Was he in custody? He was in custody. So, 128 o'clock is running no matter what, right? Correct. So, as we mentioned in the last case, we're all former trial judges here. And the guy goes from demanding his speedy trial to the day of trial saying, I need a continuance to obtain a private lawyer. What had he been doing for the previous two and a half months in that regard? He had been attempting to work with his public defender. So, he only... Attempting to work with a public defender is not inconsistent with trying to see if he can also hire a private counsel, is it? No, but... What had he been doing? What does the record show of his efforts prior to the day of the trial began to hire a private counsel? The record just indicates that he had spoken to some private attorneys about potentially taking his case, but that none of them had agreed yet to take his case. So, no one was ready to enter his or her appearance on behalf of the defendant as trial counsel? Correct, not on September 11th. Okay. And, nevertheless, your claim is the trial court abused its discretion by denying his request for a continuance, is that right? Yes. Doesn't the law require on the day of trial that if the defendant is seeking to delay to get counsel to appear, that there must be counsel who is, if not ready and willing to show up that day, indicating to the trial court that I'll be ready soon? Isn't that correct? I don't know that it's a requirement. Generally... I mean, this is... I'm the trial judge and I hear this request, and I say, well, counsel, or Mr. Defendant, who's this lawyer? Do you have anyone ready? In fact, he had no one. Isn't that correct? Correct. And generally, courts have found that it is not an abuse of discretion if on the day of trial the defendant asks for a continuance to obtain private counsel because there's no private attorney there ready and willing to enter an appearance on the case. Well, we've had other cases, and I remember personally as a trial judge, if I have a lawyer who says, yes, I've been contacted by Mr. Deere, using him as an example, and I'm not ready to enter my appearance today, but if you continue this for a week, I will. But we don't have that here, do we? No. No, literally, we don't even have a name from the defendant asking any lawyer he ever contacted, do we? We do not. The court never asked him for any names. Nor did he volunteer. Correct. I mean, this is not a guy who's shy about making statements, is he? No. And he provides no information at all about who he contacted. Indeed, did he mention that he had, in fact, contacted anyone at that point? He said that he had been in touch with, he did not say how many, but he indicated more than one potential private. And did he provide a name? He did not. More than one? He provided no names of any? No. Well, how do we conclude that the trial court abused its discretion by denying this request when this is the state of the record? This case is an exception that proves the rule that generally, if an attorney is not ready and willing to enter into appearance on the day of trial, it's not an abuse of discretion to deny the request for continuance. And it is the exception to the rule because this is such a tight timeline, because Mr. Deere. At whose insistence? He's demanded a speedy trial. Yes. He could have waived his speedy trial right. He could have decided, okay, I don't want a speedy trial. If it means I'm going to have to go to trial this soon, back when they talked about it in September, on the 2nd, I'm sorry, on the 5th, and on the 9th. I mean, they were supposed to go to trial on the 9th, and then another case bumped them.  Yes. Okay, wait a minute. You know what? I'm trying to get a lawyer, so I'm willing to waive my speedy trial right and so that I can have time to do that. Instead, what we've got is a record that looks like he's trying to play both sides of this, because this is not a guy who's a total stranger to the system. I want that speedy trial running, but now I want time. And I'm going to make my motion on the day we're picking the jury. He's had three previous occasions when he could have raised this same issue, had he chosen to. Well, he could not. He did not have three different occasions, because the first time he met with his attorney was August 1st, on the day he demanded trial. And so the day he meets his attorney, he has no reason to expect that his attorney would not be prepared for trial. Wait a minute. This strikes me as a little bit strange and contradictory. He meets his attorney on that day, saying he has no reason to expect his attorney is going to be ready to try the case. He demanded trial that day, didn't he? Yes. I'm sorry. I might have misspoke. I meant to say that there's no reason for him to expect that his attorney would not be ready for trial in a month. Well, so he demands trial. And here's the same lawyer. And it's a month later, actually, that the case goes to trial. Isn't that right? A little over a month later. Okay. So, by the way, going back to your original answer to my question, this is the exception to the rule. What's exceptional about this? It seems to me, if anything, the facts here are worse than in most cases, where people have asked for continuance and because I want to get some lawyer. Here we have no names. Here we have no one who's actually approached. Here we have nothing. It's because of the condensed timeline that this case is so unique. Because the first time Mr. Deere spoke to his attorney was August 1st. The second time he spoke to his attorney was September 5th. So they had not talked for over a month. I think the lawyer, when questioned, said that they had talked on several occasions. I thought he said in the holding area. So, obviously, pre-trial hearings and things of that nature. They only appeared in court. Mr. McElvine, he only appeared in court on August 1st, September 5th, September 9th. And he got COVID. Yes, after August 1st, he was sick. So he was out of the office for two weeks. When he returned, he had another case. Another speedy trial case. Yes, another speedy trial. And that was the trial that went on September 9th, Mr. Deere's original trial date. But back on the 5th, when it became obvious that, look, he's preparing on another case, the defendant easily could have said, wait a minute, judge, I've got a problem here. He doesn't have enough time to try my case, to prepare my case. I'm willing to give up my speedy trial so that we can have some more time. It's not clear that when they appeared in court on September 5th that they had had enough time to talk for Mr. Deere to maybe understand the level of his attorney's preparedness. Well, and even if he chose not to get another lawyer, he could have easily said, look, I understand. You've been sick. You've got this other trial. Judge, I'm willing to waive my speedy so that my lawyer's got more time to prepare. Instead, he says, no, I'm looking for lawyers. Well, who? Well, I don't have any names. Well, he was not asked to. If he had been asked, it is possible he would have provided the names. Because in this case, the trial court asked him a couple of questions about why he was looking to hire a new attorney, what his problems with his current attorney were like. He then indicated that he was likely not going to grant the continuance, kind of stopped himself, asked Mr. Deere, well, have you been in touch with anyone? And Mr. Deere said, yeah, I've talked to a couple of them, but no one who has agreed to take the case yet. And then the trial court said, okay, like I said, I will not grant the motion for continuance. This is addressed in the trial court's sound discretion, is it not? Yes. And this court has written that the trial court abuses its discretion when its feeling is arbitrary or when no reasonable person would take the view adopted by the trial court. So the argument to us that under the facts of this case, when the defendant said I want a continuance to try to get a private lawyer, and the trial court denied it, no reasonable person in that context could have made that same ruling. Is that your argument? Correct, because there's nothing about Mr. Deere's request that indicated it was an attempt to delay. As your Honor said, he is the one who asked for the speedy trial. It is very clear from the documents he was sending his attorney that he thought this was an open and shut case. He lived at 219 Avenue E in Bloomington, and because he lived there, he could not invade his own home. And so that is why he requested a speedy trial. And so it was against what he wanted. His request for a continuance to obtain counsel was against what he really wanted, which was a speedy trial. But by the time of trial, he realized his attorney had not subpoenaed any witnesses, was not planning on introducing any of this documentary evidence that Mr. Deere wanted him. And now all that was discussed with the court. Yes. Again, in this case, it is the condensed timeline. Because there was just no reason for Mr. Deere to search for a private attorney before September 5th. I want to ask a question about his ability to search for a private attorney. He said, I think I'm going to get my settlement money in three weeks or a month. What settlement? Was that explained? Where was the money going to come from to hire private counsel? It's not clear from his discussion with the court, but he was waiting on a worker's compensation claim. There is evidence in the record of that, and he did eventually receive that money. That is discussed in the PSI. Thank you for answering that. Yes. And so he did have plans to hire a private attorney. And the next day, on September 12th, before his trial started, counsel renewed Mr. Deere's request for continuance to obtain private counsel. And during that time, an unidentified woman who was sitting in the crowd, I presume, indicated that an attorney was almost hired. And so it's clear that Mr. Deere both wanted his right to a speedy trial, but also wanted his right to effective assistance. And what I think is the most critical is that there's no reason to believe that a private attorney could not have tried this case within the speedy trial term. By the 12th, what was the status of the jury? I'm sorry? By the 12th, what was the status of the jury? By the 12th, I think they had been chosen. I do not think they had been sworn. But Mr. Deere did originally ask for a continuance before anything occurred with the jury. It was just counsel's renewal of the request. Going back to the question of the sufficiency of the evidence, defense counsel argued that the defendant had the authority to enter, didn't he? He did. And claimed about how he brought out the relationship between the defendant and the victim over a period of time, and brought out when the defendant was last, for lack of a better word, coming to finally get out. That was all before the jury, wasn't it? Yes, but authority is concerned with permission. It is not kind of the layman's term of authority. Yes, I have authority to go into my own home. But in the home invasion statute, authority is more concerned with an invitation to come in for someone who is not a resident. And so that's why in this very specific case, with this very condensed timeline, it was very important for counsel, and he could have still used the word authority. He could have said he had authority to enter his home, but what he needed to really emphasize for the jury was that he did not need Altuch's permission to be in his own home. That's what he said. Well, he said... He kept saying that it was his own home. He didn't need permission. He didn't need authority. Well, no, he said he did have authority. And so that's where it is confusing, because he said this was his home, he could be at his home, he had authority to be at his home. So what circumstance could you envision, other than if they're being excluded by an order of the court, if it's your home, you wouldn't have authority? I'm sorry, can you ask that again? Sure. What circumstance can you envision where if it's your home, you don't have authority to enter, absent a court order prohibiting you from doing so? I think that's where the layman's term kind of authority comes in. I want to back up to my question, because you're saying that the counsel was ineffective for not drawing a distinction. I'm still trying to figure out what a distinction needed to be drawn if his argument was it was his own home. Go ahead and answer the question. Don't worry about the watch. He needed to emphasize that it was his own home, and therefore did not need to give him permission. She testified that she did not invite him over on that Sunday evening. She said she was not expecting him. But if he lived there, he did not need an invitation to be at his own home. He did not need anyone to be expecting him to be there. And so if the jury thought that Mr. Deere needed to, if the jury thought that the state needed to prove both, that it was the dwelling place of another, and that he had authority, as in all chutes, permission to be there, then that is confusing for the jury, because he did not need both of those things. I want to ask one more question. Go ahead. She owns the trailer. Correct. He's not a joint tenant. The jury hears the testimony. He says, I lived there for 11 or 12 months. I paid the rent twice. He testified that he paid the rent on all of the bills because he was the only person working. All two testified that he only paid the rent twice and did not say anything about the bills. I thought he said also that he only paid the rent twice. I was asking about the other bills. No, I don't believe he specified how many times he paid the rent. Thank you. Thank you, counsel. I'll just invite counsel to come to the bench. I'm not sure I want to risk it. And I want to mention again, as I did last time, that this is a court that welcomes the involvement of 7-Eleven students. And I think it's a good thing. And as we just heard from the prior argument, a nice job. I'm sure you'll do a nice one as well. So with that, you may proceed, counsel. Thank you, Your Honors. May it please the Court? Counsel. Good afternoon, Your Honors. My name is Julie Matuszewski, and I'm a 7-Eleven student under the supervision of the Illinois State Appellate Prosecutor's Office, representing the people. Your Honors, this is a case that involves a defendant who was told to leave his ex-girlfriend's home, left, returned two days later, enforced entry, and then attacked an occupant inside. I am here today to respectfully request that this Court affirm the judgment of all four issues. I'd like to begin with the third issue on appeal, Your Honors, regarding the continuance motion. My opposing colleague characterizes this issue as a counsel of choice issue. However, that is not the issue here. The defendant had a constitutional right to be represented by an attorney because he could not afford one. But he did not have a constitutional right to be represented by a public defender of his choosing. And in the denial of the continuance motion, the trial court itself even told the defendant that he did not have the authority to assign him a new public defender. Furthermore, Your Honors, this issue is reviewed under the abuse of discretion standard, which is the most deferential standard, permitting reversal only when a decision is so unreasonable that no judge in similar circumstances would have made the same decision. Here, the trial court was well within its discretion to deny the motion, and the court took the time to conduct a thorough questioning of the defendant before ultimately reaching its decision. When the court first called the case on September 11th, Your Honors, it noted that it was up for jury trial before noting that the defendant was not in his street clothes. The court then was advised of the defendant's wish to secure new counsel by his trial counsel, who stated that the defendant had told him just a few minutes ago that he no longer wished to be represented by his trial counsel. The court then spoke directly to the defendant, who stated that he was not receiving a satisfactory defense, which the court said was too nebulous of a claim, and then asked the defendant to further specify. Like I said, the court noted that it did not have the authority to change his public defender, and it went through a series of questions with the defendant regarding if he had secured new counsel. As my opposing colleague noted, the defendant provided no such name. Let me ask you a question. Did the defendant ask or say, I'll take a public defender, but I need somebody other than this guy? He did not, Your Honor, and furthermore, the defendant did not make a request to proceed per se. When questioning the defendant, the defendant advised the court that he had a settlement check that would be coming to quote the defendant in three or four weeks. However, it is unclear if that settlement check would have arrived by that time, and even if it did, the amount of the settlement check was undisclosed, meaning that it may have not even been sufficient to afford a retainer in the first place. Did the defendant indicate he had attempted to contact some lawyers? He did, Your Honor. He said that he was in communication, but he did not provide any names or any specifics regarding that timeline. Again, it sure would have been nice if the trial court had said, who have you contacted? What office and the rest of it? Do we probably have none of that in this record? Unfortunately, Your Honor, we do not. Okay, go ahead. And based on the totality of these circumstances, Your Honor, the trial court denied the motion for continuance. The defendant states that this was not a delay tactic, but even accepting the defendant's explanation, the trial court was still within its discretion to ultimately deny the continuance motion. As my opposing colleague stated, it would likely not have been an abusive discussion if the court had granted the motion, but the key there, Your Honors, is that the court could have, not that they had to. Because the question before this court today is not whether a judge could have granted the motion or even if this court would have. The abusive discussion standard only permits reversal if the court deems the trial court's denial so unreasonable that no reasonable judge would have made the same decision in those circumstances. To address the sufficiency of the evidence issue appeal, Your Honors, the defendant's argument overlooks the fact that the jury in its role as the finder of fact concluded that the defendant, rejected the defendant's claims that he still lived there, therefore resolving this case. When faced with the challenge to the sufficiency of the evidence, the relevant question is whether after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found that the elements of the crime were met beyond a reasonable doubt. And that is the case here. Because as the finder of fact, the jury found that the defendant broke into his ex-girlfriend's home. And this is exactly the conduct outlined in statutory law governing home invasion and criminal trespass to residence, Your Honor. Defendant entered the dwelling place of another without authority to do so. And furthermore, concrete evidence supported the jury's verdict. Even defendant's trial counsel conceded, as seen on page 172 and 173 of the report of proceedings, that defendant was not on the title of the home and that he had no formal rental agreement or lease either. Well, but that's not necessarily a requirement for him to think that he has authority to enter, is it? It isn't, Your Honor. However, it is a factor that the jury may weigh in determining its decision. In its reply brief, the defendant asked this court to consider more informal living arrangements and relies on People v. Dela Cruz. However, People v. Dela Cruz is not applicable here. In People v. Dela Cruz, the second district found that the victim's testimony, the landlord's testimony, and the presence of defendant's furniture, clothing, and tools in the apartment raised reasonable doubts as to whether or not it was the defendant's home. And that is not the case here. By the time of June 14th, by the time of the home invasion, defendant had already removed all of his items and his clothing was found in his vehicle. So, I want to make sure I understand. For many months, defendant had lived there off and on and had some of his property present, is that right? Yes, Your Honor. And as of the date in the question, I guess it was two days before that, he was entirely moved out? Yes, Your Honor. It is the state's understanding that Rebecca Alshue... What about the dog? Wasn't there a dog at issue here too? There is a dog at issue, Your Honors. Neither party has brought up the dog beyond the initial statement of facts, so it is unclear where the dog is currently located. Although, considering the defendant is in prison, it is likely with Rebecca Alshue. Did the dog leave with the defendant? Or how did that work? There's no indication in the record that the dog left, Your Honors. Go ahead. And furthermore, Your Honor, the jury itself heard defendant's inconsistent statements because defendant had provided a multitude of inconsistent statements to the police, changing from he never entered the home, to he did, but he didn't attack anyone, to he tried to hit Thomas and missed, to ultimately that he hit Thomas. And furthermore, a screwdriver that was in the defendant's possession was found in the living room of Rebecca Alshue. The defendant made inconsistent statements about many of the factual matters. Did he ever make a statement indicating that he did not believe he had authority to enter the house? He did not make that such statement, Your Honor. Okay, go ahead. However, the jury, based on the totality of the evidence against the defendant, was well within its discretion to ultimately conclude that he had committed home invasion. The defendant's arguments, furthermore, to briefly touch on the lot rent, even if they're true, are not sufficient to overcome a home invasion. And in People v. Hudson, the second district, and in People v. Richmond, the first district, courts, in these cases, explicitly rejected the argument that even the payment of all bills is sufficient to overcome a conviction. And furthermore, defendant also argues in his reply brief that Rebecca Alshue and him were merely on a break, and that he actually didn't stop living at the home, a claim which she denied at trial. But it was a claim to be decided based by the jury, which the jury ultimately held in the state's favor. Because furthermore, Your Honors, whether or not Rebecca Alshue and the defendant were on a break or not does not change the fact that as the sole homeowner, only Rebecca Alshue had the ability to provide defendant authority to remain in the home. And by kicking him out, she showed that she no longer wished for him to be there, regardless of their relationship status. Did the defendant testify about her kicking him out and how that worked? Is that explained through his eyes at all? Your Honor, the defendant provides testimony saying that they got into a slight argument. He does not specify the nature of that argument, and he says that he left to give her space, and that they were merely on a break. That's when he took all his stuff out? Yes, Your Honor. Okay. Go ahead. To briefly touch on the criminal trespass to residence jurisdiction, Your Honor, as a merger and sentence charge, this court's jurisdiction regarding that is limited to remanding for imposition of sentence to hold otherwise would be a violation of the Elmhurst Supreme Court's will as directly stated in People v. Rutherford. To address the second issue on appeal, Your Honors, trial counsel did not conflate the statutory elements of dwelling place of another with authority. Defendant's ineffective assistance claim here fails for two independent reasons. First, because trial counsel's argument accurately reflected the elements of the statute, and second, there's no reasonable probability that the jury was confused or that the outcome would have been different. To address the first reason, trial counsel's performance was not deficient. Counsel's theory of the case was built on statutory elements. Trial counsel argued that the defendant lived at the residence and therefore had the authority to enter. This is not a misstatement but a direct reflection of the statutory structure. The statute requires entry into the dwelling place of another without the authority to do so, and if the dwelling place was not of another, if it was the defendant's home, then such authority is inherent. Counsel did not conflate these elements, Your Honors. Instead, he explained to the jury the relationship between them. Defendant claims that trial counsel improperly merged these two elements, therefore confusing the jury into believing that he needed permission from Alshu even if he lived there. But in reality, counsel presented a unified theory. If the defendant lived there, the state could not prove either element. Counsel himself said so in his closing argument, stating, I think it's important to note that he did have the authority to enter, that this was his house, as seen on page 313 of the report of proceedings. So you think that was an appropriate response to the state's case? I think that was, Your Honor, and the trial counsel further followed that up with support that he did live there. He argued that he had lived there for several months, he had been sharing expenses, he paid a lot rent, and he was a joint tenant with Rebecca Alshu. He hadn't been evicted, and there was no court order barring his entry. Far from being deficient, counsel provided a zealous argument based on the circumstances that he was presented with. And second, defendant has failed to meet his burden of proof establishing that he was prejudiced by trial counsel's conduct. The defense's theory depends on speculation about jury confusion. The defendant argues the jury might have believed that the defendant lived there, but convicted him anyway because he lacked authority. But there's no basis in the record for that assumption. And significantly, Your Honors, the jury was properly instructed in this case. The jury instructions clearly separated the elements of the statute and required proof of one place or another. And there has been no issue regarding the jury instructions raised by the defendant. And at trial, even the trial counsel worked with the prosecution to create these jury instructions that were used. Far from providing an effective assistance, Your Honors, trial counsel zealously advocated for his client using the best strategies available based on the evidence. Given the evidence of his forced entry, of Alshu's revoked consent, and the physical violence against Brendan Thomas, trial counsel pursued the only plausible theory, that the defendant lived at the home, and because he lived there, he had the authority to enter. No alternative phrasing would overcome these facts. And even assuming Armando, any imprecision in counsel's phrasing, the defendant still cannot show prejudice because the jury rejected his residency claims and was properly instructed on the elements. To address the final issue on appeal, Your Honors, the trial court conducted an adequate crankle inquiry and correctly found the appointment of independent investigatory counsel was not warranted. When the defendant raises a post-trial motion of claims of ineffective assistance, the trial court must conduct a preliminary crankle inquiry. If these concerns merely pertain to trial strategy, then no further proceedings are necessary. And that's exactly what occurred here. The trial court's crankle inquiry was adequate. As this court is held, ordinarily an adequate inquiry may include questioning the trial counsel, questioning the defendant, or relying on its own knowledge of the trial counsel's performance in the trial. As this court held in People v. Smith, citing People v. Peacock. Here, the court allowed the defendant to state each claim and reaffirmed several times to ensure that the defendant had said everything that he wished to do so. He then questioned trial counsel on all of these issues and considered the timing and the feasibility of the issues, then why they did not warrant further inquiry. This is more than enough to satisfy crankle. And furthermore, Your Honors, each allegation was properly rejected. The defendant is raising two issues regarding this aspect, which is a witness list and an impeachment. I'd like to address each in turn. For the witness list, defendant claims the trial counsel failed to call witnesses does not demonstrate possible neglect because the record shows that this was a matter of late disclosure and unsupported speculation, not deficient investigation by counsel. Defendant did not provide a witness list until five days before trial. Counsel did not ignore known witnesses. Counsel was presented with them too late to reasonably investigate them or secure their testimony. Crankle does not require counsel to perform last-minute investigations of newly disclosed witnesses so close to trial. The defendant himself... Was there any discussion at the Crankle hearing on why these witnesses weren't provided to counsel sooner? Your Honor, there is a slight dispute. The defendant alleges that he told his counsel previously verbally about them on August 1st. There is no indication in the record that such exchange was made. The court then asked both parties to further explain that issue, and counsel explained that he did not receive a written list of the witnesses and that he did not recall the earlier alleged conversation. But regardless, he did not receive a written list of the witnesses until September 6th, which the court determined was too late to reasonably pursue, and the defendant did not dispute that characterization any further. Did counsel also indicate that he considered the defendant's witnesses and determined that none of them would have had testimony that was particularly relevant or would have tipped the case in his direction? Yes, Your Honor. That is also accurate. So he did consider the witnesses. He was told the witnesses and what they were supposedly to be there for, and he said, I've considered that and didn't find it to be either helpful or beneficial to the defendant. And furthermore, Your Honors, in regards to the witness list, this was a seven-person witness list. Of three of those, one was Rebecca Alshue, who already testified, and the other was his parole managers. This ties into the defendant's allegation that letters should have been introduced at trial to prove his residence. Trial counsel reasonably did not want to include these witnesses because they would only testify that he lived at the home, which Rebecca Alshue had already conceded to. And furthermore, Your Honors, the witnesses of his parole officers would be likely prejudicial to the jury, and even the trial court itself briefly explained this to the defendant during the Krinkle inquiry. So again, the trial court said what? The trial court explained to the defendant that there was a risk of prejudice if his parole officers were called to say that he lived there because they would be subject to cross-examination by the state.  And furthermore, counsel in this regarding the witnesses, Your Honors. If we could just back up a second to be clear. All that they were going to be able to testify to was that he had lived there at some point. Yes, Your Honors. There was no indication by the defendant that he had a parole officer who was going to testify if he lived there on the date of this offense. That's correct, Your Honor. And furthermore, Rebecca Alshue had previously signed a form from his parole manager that allowed him to stay at the home, but that form expired on June 12th, which was before any of these issues had arisen. And furthermore, to briefly touch on the impeachment, Your Honors. Decisions about cross-examination and impeachment fall squarely within counsel's strategic professional judgment. Defendant has not identified any material impeachment that would undermine Alshue's testimony, and without that, the claim remains speculative. Defendant is asking this court to hold that Alshue should have been impeached, such as with cash-out payments, but that would likely not have impeached her. Defendant claims these records would have proven that Rebecca Alshue and him spoke after their breakup, but it is unclear what impeachment purpose this fact, even if taken as true, would serve. And furthermore, cash-out payments demonstrate that, although they don't demonstrate that Rebecca Alshue and the defendant had even spoken, since the payments could have been an attempt, an unsuccessful attempt, to get Rebecca Alshue's attention. And to touch briefly on the defendant's reliance on People v. Lawson, Your Honors, in regards to the impeachment. Defendant cites to People v. Lawson, which holds that the complete failure to impeach the sole eyewitness when significant is available is not trial strategy, and that may support an effective assistance claim. But the impeachment purpose in that case differs. Trial counsel did not impeach the only employee and the only person in that case to identify the defendant, and the defendant in that case had raised issues and claims to counsel that the employee knew him previously and was motivated to lie. None of these are an issue in this case. Your Honors, at its core, this case turns on a simple point. The jury did not believe that the defendant lived at Rebecca Alshue's home. The jury heard the evidence presented by both sides, resolved the conflicts, and returned a verdict supported by the record. Defendant's remaining arguments invite this court to look beyond the jury's findings or to speculate about potential error, but the record and inapplicable standards of review do not permit doing so. If the record had suggested... Your Honors, I see my time has expired. I'll let you finish. Thank you. If the record suggested jury confusion or insufficient evidence, that would be a different case. But here the record reflects a properly instructed jury and a supported verdict. And for these reasons, we respectfully ask this court to affirm. Thank you. Thank you, counsel. Ms. Carlosi? I'd like to start with clarifying some of the record. Alshue testified that she and Mr. Deere got into an argument on Friday night. He left and took all of his belongings. Mr. Deere testified that on Friday he left work early to attend to some personal matters related to custody of one of his children. He went home. Alshue was not there. He said that Alshue was in Saybrook on Friday night, and she did not return home until Saturday afternoon. He then said that on Saturday he visited his mother, and then he and Alshue were together for the rest of the day and into the night. He then testified that on Sunday, June 16th, they woke up in the morning and talked about going to the lake. Then they had a disagreement, and they parted ways. Mr. Deere said that Alshue had simply told him she wanted some space and time to herself, and so he went to a friend's house. He said that he later returned that day. which is corroborated by, I believe, Alshue's testimony herself, because she went somewhere with her ex-husband. And so he said that after Alshue left, he returned to the home to let Aspen, the dog, out. Furthermore, there was a third-party witness who was a witness for the state who testified that he saw Mr. Deere at the house every day that weekend. He saw him there on Friday, he saw him there on Saturday, and he saw him there on Sunday. When was the date of the alleged home invasion? Sunday, June 16th. So that was what you just described? That was when the defendant is claiming he's still just residing there? Yes, he said that they got into an argument, they parted ways. When did all his belongings get moved out, according to him? He was not asked about when his belongings were out. Did he testify about when all his belongings got moved out, whether he was asked or not? He did not testify about his belongings. So at most, why isn't this just the disagreement on the events between Alshue and the defendant? And why isn't the jury entitled to believe her and not him? Because even Alshue's testimony about whether he lived there was equivocal on its own. Because she said that she had him moved out, but then she said that she, but when further asked by cross-examination, she said he did not agree to move out, and what she said was she asked him to remove himself, and he did. That's all she said. That was two days before the question, right? That's what she testified to, yes. What's equivocal about that? Because this relationship between Mr. Deere and Alshue was very obviously not a healthy relationship, and volatile. She testified that he'd been living there off and on since he started living with her, partly due to his behavior towards her. And so there was nothing about her testimony that indicated that this time, when she asked Mr. Deere to simply remove himself, that this was permanent. And there's no reason to— She didn't testify that he didn't have any authority to bust in the door that night. She didn't testify specifically about that, but simply busting in a door, because the trailer was Alshue's, that is— Did she testify about whether he had authority to come in that night? She said that she did not invite him over, and that she was not expecting him. But if he lived there, her invitation is irrelevant. Her testimony is, he took his belongings, and he took the dog. No, the dog— She didn't testify to that? No, the dog was still there. So she claimed that he took all of his belongings, which I find highly unlikely, because I know that whenever I go somewhere, I tend to leave something, even for a short visit. And so I find it highly unlikely that someone who's been living somewhere for nine months is able to take everything in a single evening. But I digress. The dog was still there. Alshue testified that the dog was still there. The neighbor who testified that he saw Mr. Deere at the home on Friday, Saturday, and Sunday also saw the dog on Sunday, because he heard some loud noises, which was the incident at issue here, and he went outside and he saw Alshue and the dog. I want to ask about the parole officer. Didn't Alshue testify that she had told the parole officer that the defendant was living with her? Yes. So then what was the need to call the parole officer about Alshue's making that statement when she had already testified to it? So only one of the people that was included in Mr. Deere's witness list was a parole officer. I'm not sure why the state believes that all of those witnesses were parole officers, but only one of them was there. That doesn't answer my question. My question is, given what Alshue testified about, what would the testimony of the parole officer have added? In this case, I don't think that it would have added anything substantive. But you raised that as one of the failures of counsel in the critical hearing. It was unexplained and all the rest of that, right? We raised that counsel did not investigate any of the other witnesses who were not parole officers and who could have testified to something else, not necessarily about his legal status, about whether he lived there, but this is... Did the defendant explain any of that when the court inquired and gave him all the time he wanted to explain why he thought that these were errors of the trial? He said that... Did he outline each witness and say, this whole thing is important? No, he did not. But the court did not ask these questions. And it's the court's... Well, did the court conduct a reasonable criminal inquiry? No, that is what... You're saying the requirements are that the court specifically inquire as to each factual allegation of a defendant in the Krankel hearing. Yes. That's the standard you're saying Krankel has now moved to. Well, in this case, we believe that just counsel's failure to even investigate any of these witnesses shows that there is neglect for whether it was an adequate inquiry, excuse me. There were some other things that the court completely failed... What testimony would have been presented that wasn't presented through any other witness? We don't know because the court did not ask what these witnesses... I mean, the court gave him all the time at the Krankel hearing that he wished to explain why this was important and why his lawyer dropped the ball by not pursuing it. The court never asked him what these witnesses would have testified to, and Mr. Deere also did not provide that information, but it is the court's duty to conduct an adequate Krankel inquiry. In arguing that the Krankel inquiry was inadequate, what we argued is that... I mean, the court did not ask Mr. Deere what these proposed witnesses would have testified to, but even in addition to that, it didn't ask counsel about what possible evidence would have corroborated Mr. Deere's testimony that he had paid the lot rent. He didn't ask counsel about case law that Mr. Deere supplied to him, but most importantly, he didn't ask about the jail call that Mr. Deere had with Paul Chute on July 9th, 2024. Because that could have... Jail calls are recorded, and so what is contained in that call could have, at the very least... I don't know. That's why this Krankel inquiry was not adequate. I think the failure to ask about the call is our strongest argument, that this inquiry was not accurate because we don't know what was in the call, but it could have provided impeachment evidence to impeach Al Chute, or because it was recorded, it could have provided substantive evidence. And so, if Al Chute had regretted, perhaps, her decision to break up with Mr. Deere, and they briefly rekindled their relationship, she could have said, I didn't really kick you out, of course we were going to get back together, but we don't know because the court didn't ask. Well, thank you, counsel. It turns out we're giving you some additional time to pursue this matter. I want to mention that I thought both counsel did a very nice job, and one of the things that's very important to the court, we ask a lot of questions, and to get responses, and I appreciate your direct responses, and your direct responses, it was really very helpful to the court, and I thank you both. And in regard to you, you really kept your composure. Absolutely. When we poked and cried at you about the first issue, and to continue and sort of try to get it under the law. And to really appreciate that. It's a very professional way to handle it, and we do appreciate it. Thank you. The court will take this matter into resolution. Stand and recess.